UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

KIN HO MICHAEL PAN,

Plaintiff,

v.

UNITED PARCEL SERVICE, INC.,

Defendant.

-------------------------------------------------------x

Civ. Action #:  1:26-cv-00643

COMPLAINT

Jury Trial Demanded

Plaintiff Kin Ho Michael Pan ("Plaintiff" or "Mr. Pan"), by his attorneys, Law Office of Alan G. Johnson, alleges as follows against Defendant United Parcel Service, Inc. ("UPS" or "Defendant"):

**NATURE OF THE ACTION**

1.      This employment discrimination action arises from United Parcel Service, Inc.'s ("UPS") unlawful termination of Plaintiff on March 14, 2025, on the basis of age, disability, race, and national origin, and in retaliation for Plaintiff's protected activity, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"); the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); New York State Human Rights Law ("NYSHRL") and N.Y. Exec. Law § 290.

2.      UPS used a selectively enforced and pretextual data-security justification to remove one of the oldest employees in Defendants' Systems Engineering department at the Mahwah location, in anticipation of the April 2025 sale of that department to NTT Data, in order to present a younger, less expensive, and ostensibly lower-risk workforce. Plaintiff's termination

was also motivated by unlawful discrimination based on his race and national origin, and motivated by retaliatory animus for having sought a small disability accommodation.

## JURISDICTION AND VENUE

3.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiff's claims arise under federal anti-discrimination statutes.

4.     This Court has personal jurisdiction over Defendant pursuant to New York's long-arm statute, CPLR § 302(a), because Defendant transacted business in New York by directing Plaintiff to perform substantial work from New York, communicated employment decisions into New York, and committed acts causing injury to Plaintiff in New York. The exercise of jurisdiction by this Court comports with due process.

5.     This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiff performed a substantial portion of his work remotely from his home in Westbury, New York, the discriminatory decision had impact in this District, and UPS transacts business in this District.

7.     On November 19, 2025, the United States Equal Employment Opportunity Commission ("EEOC") issued to Plaintiff a Notice of Right to Sue Defendant based on Plaintiff's timely-filed Charge of Discrimination No. 524-2026-00187 against Defendant.

## PARTIES

8.     Plaintiff Kin Ho Michael Pan is a resident of Westbury, New York who until his termination worked in UPS Systems Engineering department (herein "Systems Engineering").

9.      Defendant is a Delaware corporation with its principal executive offices at 55 Glenlake Parkway NE, Atlanta, Georgia 30328. At all relevant times UPS was Plaintiff's employer within the meaning of the ADEA, ADA, Title VII, and NYSHRL.

**STATEMENT OF FACTS**

10.     Plaintiff was employed by UPS for more than twenty years.

11.     Plaintiff's recent role was as an information-technology professional in Systems Engineering assigned to Defendant's Mahwah, NJ data center, with two weekdays worked remotely from his home in Westbury, NY.

12.     In winter 2024/2025, Defendant was in closed-door discussions about selling its Systems Engineering department to NTT Data; the sale was completed in April 2025.

13.     Plaintiff was 47 years old at the time of his termination and was the oldest member of his immediate team by eight years.

14.     Approximately seventy percent of workers in Systems Engineering were under age 40.

15.     Mr. Pan's retirement benefits would have vested in a few years; additionally, Defendant was making additional contributions toward non-union employees' 401(k) plan under a 2023 bargaining agreement that benefitted Plaintiff.

### *Defendant Was Aware of Plaintiff's Disability Before Sale to NTT Data*

16.     At relevant times, Plaintiff suffered from a physical impairment affecting his cervical and lumbar spine that caused chronic pain and spasms and substantially limited one or more major life activities, including standing and sitting.

17.     On or about January 17, 2025, Plaintiff submitted a request for an ADA accommodation, specifically, a standing desk to help minimize pain while working.

18.    Shortly after the request, Plaintiff's manager, David Carper, told Plaintiff that he "should have run [the ADA request] by him first," reflecting hostility toward Plaintiff's protected activity.

### *Defendant Managers' Bias Towards Plaintiff Based on Race and National Origin*

19.    Plaintiff is of Chinese descent and appears to be of Chinese national origin.

20.    In late February 2025, Plaintiff requested and received approval for a permitted leave of absence, that would have begun March 27, 2025, to travel to Asia with his wife to visit a terminally ill relative.

21.    Plaintiff's travel request coincided with then-existing heightened geopolitical tensions and anti-Chinese sentiment related to tariffs.

22.    Plaintiff also took two and a half (2.5) days sick leave in February 2025 due to a respiratory illness (COPD), which Plaintiff believes management conflated with stereotypes based on race and national origin related to Covid-19 origin theories.

23.    Upon information and belief, Defendant's managers made assumptions tied to Plaintiff's perceived national origin, including beliefs regarding foreignness, loyalty, and risk associated with Plaintiff's Chinese descent, and treated Plaintiff as a heightened operational and security risk on the basis of his Chinese descent.

24.    These national-origin-based assumptions informed Defendant's decision to terminate Plaintiff, and support an inference of unlawful discrimination.

### *Defendant's HR policy documents and external drive policy*

25.    Defendant publishes multiple workforce policy guides, including "UPS Policy Book", "Code of Business Conduct", "UPS Information Security and Privacy Manual",

"Standard Practice Manual" and "UPS Employee Handbook" all of which articulate procedural fairness in employee dealings with management.

26.     Defendant has a written policy specific to use of company-approved *external storage drives,* e.g. USB storage devices. This policy is not described as a "one-strike" termination rule.

27.     Defendant supervisors, for example Ricardo Pacheco, discouraged employees from requesting company-issued external drives to avoid *"spending the department's already low budget".*

28.     Defendant's USB device policy was widely disregarded, and in practice, neither consistently nor uniformly enforced. Other UPS workers have, for years, used personal USB drives without incident, for example, Glenn Rice, UPS East Region President; John Helmus; Mike Ferony (who also used an unencrypted mobile personal digital assistant device); Tim Almquist; Norman Wynn; and others, without investigation or disciplinary consequence; all are non-Asian.

29.     Plaintiff had used the same USB device that Defendant claims triggered a security alert, on multiple occasions in recent years, in connection with backing up his work station and those of others, without interest, investigation, or discipline by Defendant.

30.     The USB device cited by Defendant in terminating Plaintiff's employment, contained the same data Plaintiff had maintained on prior USB devices over the past four to six years, and some data going back to 2004, as he periodically replaced older devices while preserving their contents.

31.     To the extent Defendant contends that purportedly "restricted" material on Plaintiff's USB device triggered a security alert, the same data had been introduced into the

computer systems of other UPS personnel without triggering a security alert or discipline, including Mr. Rice, Mr. Helmus, Mr. Ferony, Mr. Almquist, Mr. Wynn; and others.

32. Michael D'Ambrosia, Region Facilities Engineering Planning Manager, who is non-Asian, likewise regularly used a personal USB storage device to store Excel spreadsheets, RFAs, and PowerPoint presentations.

33. The selective triggering of a security alert in connection with Plaintiff's USB device — despite the repeated prior introduction of the same work-related data through Plaintiff's earlier devices and similar USB storage practices by other employees, including Caucasian employees who were not investigated or disciplined — supports an inference that Defendant's stated security rationale for Plaintiff's termination was pretextual and that Plaintiff was singled out for discipline under circumstances giving rise to an inference of unlawful discrimination.

### Defendant's Investigation Employed Leading Questioning and Relied on Plaintiff's Cooperation Against Himself

34. In or about early March 2025, UPS Security personnel advised Plaintiff that an investigation was being conducted relating to the alleged use of a USB storage device on his company-issued laptop.

35. They asked Plaintiff if they could "pick his brain" but, in fact, Plaintiff was the target of the investigation.

36. During his interview with UPS security, UPS personnel asked Plaintiff whether he had connected a USB device and what the device contained.

37. Plaintiff was fully cooperative; he stated that he recalled the January back-up, his laptop malfunctioned while working remotely from home, so he used his usual USB device to back up his work and prevent data loss at that workstation.

38.     UPS security stated that a security scan had been triggered when a USB device was connected to his laptop on or about January 27, 2025.

39.     Plaintiff was further advised that the scan did not detect malware, a virus, or any data exfiltration, and that no files on the USB device were accessed or launched on UPS' system.

40.     Plaintiff was not provided with a copy of the alleged security report, was not shown the files purportedly at issue, and was not informed of the specific nature, age, or source of the allegedly "restricted" material.

41.     Plaintiff was never given an opportunity to review, challenge, or contextualize the findings before a termination decision was made.

42.     When Plaintiff indicated uncertainty as to the contents of the drive, investigators pressed him with follow-up questions prompting speculation. Plaintiff answered candidly and in good faith, based on his understanding at the time.

43.     Defendant later relied on Plaintiff's cooperative statements, rather than any showing of access, use, or harm, as a basis for termination.

44.     Defendant withheld the underlying investigative materials and denied Plaintiff a meaningful opportunity to respond, in violation of its own policy documents.

45.     UPS's handling of the investigation discouraged candor, penalized cooperation, and departed from fair and neutral investigatory practices, further supporting an inference that the stated rationale for termination was pretextual.

### *Defendant Terminates Plaintiff*

46.     On March 14, 2025, while at his Westbury NY home office, Plaintiff was summoned to a Microsoft Teams Video Conference meeting with his direct supervisor and an HR

representative, Ms. Kalena, and was informed that his employment was terminated effective immediately.

47.    Defendant cited violation of its data-security policy as grounds for termination.

48.    When Plaintiff asked whether any alternative disciplinary outcome was available, he was told that *"that's what was decided,"* and was directed to pursue an after-the-fact internal appeal at which Plaintiff's legal counsel would not be permitted.

***The Alleged Policy Violation Was Non-Malicious, Did Not Involve Access or Use,***

49.    The USB device at issue was connected to Plaintiff's laptop solely for the purpose of backing up work-related data because Plaintiff's laptop was malfunctioning and scheduled for replacement.

50.    UPS did not provide Plaintiff with an approved or company-issued USB device for such purposes.

51.    UPS Security personnel expressly advised Plaintiff that their scan did not identify malware or a virus, and that the allegedly restricted material was not accessed, viewed, or launched on any UPS system. Plaintiff was further advised during the investigation that he was "not in trouble" because the material had not been accessed.

52.    Plaintiff explained that the USB device contained files accumulated over many years and was not routinely used by Plaintiff. Plaintiff was unaware at the time of use that the device contained any files that UPS would later characterize as restricted.

53.    The alleged material, whatever its nature, was not created, downloaded, or accessed in connection with Plaintiff's employment.

54.    Notwithstanding these undisputed facts, UPS elected to impose immediate termination—the most severe sanction available—without issuing a warning or engaging in

progressive discipline, or considering mitigating circumstances, including Plaintiff's cooperation, the absence of malicious intent, and the lack of any data security harm.

55.    Defendant UPS refused to offer progressive discipline to Plaintiff, and thereby applied different standards than those standards used for, upon information and belief, younger, white, and/or able-bodied workers.

56.    Defendant UPS ignored Plaintiff's request for a copy of its investigation report, a termination letter, his personnel file, and payment of Mr. Pan's reimbursable expense request, which processes and procedures Defendant promises in its company handbook.

### *Defendant's Deviation from Discretionary Discipline Framework*

57.    Defendant's own written policies do not mandate termination for the mere use or presence of a removable storage device.

58.    To the contrary, UPS policies contemplate contextual, proportionate, and judgment-based responses to alleged policy violations, including counseling, investigation, and graduated discipline depending on intent, risk, and actual harm.

59.    Nonetheless, in Plaintiff's case, UPS managers represented that termination was automatic and unavoidable, treating the alleged USB issue as a strict-liability offense without warning, inquiry into intent, or consideration of lesser discipline.

60.    This conversion of a discretionary policy into a purportedly mandatory termination rule was inconsistent with UPS's written policies and supports a reasonable inference that the policy was invoked as a *post-hoc* justification for a predetermined decision.

***Bypassing Required Security and Compliance Procedures***

61.     Defendant's information security policies further require that potential security issues be assessed, classified, and escalated through established security and compliance channels before disciplinary action is imposed.

62.     In Plaintiff's case, however, Defendant bypassed these procedures.

63.     There was no documented security incident classification, no determination of data loss or misuse, and no meaningful investigation consistent with UPS's incident-management framework.

64.     Instead, line management moved directly to termination, notwithstanding Plaintiff's recent request for and receipt of a workplace accommodation and his long history of satisfactory performance.

65.     The departure from required investigative and governance safeguards further supports an inference that the stated rationale for Plaintiff's termination was pretextual.

***UPS Sells Plaintiff's Department to NTT Data***

66.     In April 2025, UPS and NTT Data announced the sale of UPS Mahwah Systems Engineering department to NTT Data.

67.     News reports emphasized "reducing operational costs and risks" and "preparing for the future" and "helping clients swiftly keep pace with the markets and prepare for the future" which, in context, is reasonably understood as reflecting workforce selection considerations that are relevant to age and cost reduction.

68.     Upon information and belief, Defendant identified and retained a subset of employees for continuation post-sale, and took Plaintiff's age into consideration as a criteria in

that process, along with his disability, race, national origin, protected activities, and accruing retirement benefits.

69.     The above-stated facts support an inference of Defendant's motivation for Plaintiff's unlawful termination.

**FIRST CAUSE OF ACTION**
**Age Discrimination in Violation of the ADEA**
**29 U.S.C. § 623 et seq**

70.     Plaintiff incorporates by reference each and every allegation contained in the paragraphs above, as if fully stated herein.

71.     At all relevant times, Defendant was an employer within the meaning of the ADEA, 29 U.S.C. § 630(b).

72.     Plaintiff was employed by Defendant.

73.     Plaintiff was over the age of forty (40) at all relevant times and is a member of the class protected by the ADEA.

74.     Plaintiff was qualified for his position and performed his job duties satisfactorily throughout his employment with Defendant, including in the period immediately preceding his termination.

75.     Defendant subjected Plaintiff to an adverse employment action, including termination of his employment on March 14, 2025.

76.     Plaintiff was one of the oldest employees in his immediate work group, and substantially older than many workers in Systems Engineering.

77.    Defendant's stated reason for Plaintiff's termination—an alleged data-security policy violation—was not applied uniformly and deviated from Defendant's ordinary disciplinary practices, including the use of progressive discipline, and was imposed without adherence to Defendant's required investigative and disciplinary procedures.

78.    Upon information and belief, younger employees who engaged in comparable or more serious conduct were not terminated and were instead afforded warnings, counseling, or lesser disciplinary measures.

79.    At the time of Plaintiff's termination, Defendant was engaged in efforts to reduce costs, restructure operations, and prepare Plaintiff's department for sale or transition, creating financial incentives to remove older employees nearing enhanced retirement and benefit accruals.

80.    Defendant's decision to terminate Plaintiff occurred under circumstances giving rise to an inference of age discrimination, including selective enforcement of policy, disparate treatment of younger employees, and the timing of Plaintiff's termination relative to Defendant's restructuring efforts.

81.    Plaintiff's age was a but-for cause of Defendant's decision to terminate his employment.

82.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered lost wages, lost benefits, loss of retirement-related benefits, emotional distress, and other compensable damages.

83.    Defendant's conduct was willful within the meaning of the ADEA, entitling Plaintiff to liquidated damages, attorneys' fees, costs, and all other legal and equitable relief available under the statute.

**SECOND CAUSE OF ACTION**
**Disability Discrimination and Failure to Accommodate**
**Americans with Disabilities Act**

84.    Plaintiff incorporates by reference each and every allegation contained in the paragraphs above, as if fully stated herein.

85.    At all relevant times, Defendant was an employer within the meaning of the ADA, 42 U.S.C. § 12101 et seq.

86.    Plaintiff was employed by Defendant.

87.    Plaintiff is an individual with a disability within the meaning of the Americans with Disabilities Act due to cervical disc herniation, lumbar disc herniations and degeneration, associated chronic pain, and related functional limitations.

88.    Defendant had actual knowledge of Plaintiff's disability.

89.    Plaintiff was qualified to perform the essential functions of his position, with or without reasonable accommodation.

90.    Plaintiff requested a reasonable accommodation, namely a standing desk, to enable him to perform his job duties.

91.    Defendant approved Plaintiff's request for a reasonable accommodation.

92.    Plaintiff's manager stated that Plaintiff *"should have run [the ADA request] by him first"*.

93.    Plaintiff thereafter suffered an adverse employment action, including termination of employment.

94.    Defendant terminated Plaintiff because of his disability, or because of Defendant's perception of Plaintiff as disabled.

95.     Defendant's stated reason for termination was pretextual, and Plaintiff's disability was a motivating factor in the decision to terminate his employment.

96.     Defendant's failure to follow its own investigative and disciplinary procedures in connection with Plaintiff's termination, shortly after approving his accommodation request, further supports an inference that Plaintiff's disability and/or Defendant's perception of Plaintiff as disabled was a motivating factor in the adverse action.

97.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered economic loss, loss of current and retirement benefits, emotional distress, and other compensable damages.

98.     Defendant acted with reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to all available legal and equitable relief.

99.     Defendant's termination of Plaintiff, shortly after approving his reasonable accommodation, effectively nullified and deprived Plaintiff of the accommodation that Defendant had acknowledged was necessary for Plaintiff to perform his job at that time, further supporting the inference that Plaintiff's disability was a motivating factor in the decision to terminate his employment.

### THIRD CAUSE OF ACTION
### Retaliation in Violation of the Americans with Disabilities Act (42 U.S.C. § 12203)

100.     Plaintiff incorporates by reference each and every allegation contained in the paragraphs above, as if fully stated herein.

101.     At all relevant times, Defendant was an employer within the meaning of the ADA, 42 U.S.C. § 12101 et seq.

102.     Plaintiff was employed by Defendant.

103. Plaintiff engaged in protected activity under the Americans with Disabilities Act when, on or about January 17, 2025, he requested a reasonable accommodation for his disability, namely a standing desk.

104. Defendant had actual knowledge of Plaintiff's protected activity.

105. Defendant approved Plaintiff's accommodation request, thereby acknowledging Plaintiff's disability and his entitlement to protection under the ADA.

106. Shortly after Plaintiff requested the accommodation, Plaintiff's manager David Carper told Plaintiff *"you should have run [the ADA request] by me first,"* reflecting hostility toward Plaintiff's protected activity.

107. Following Plaintiff's accommodation request, Defendant subjected Plaintiff to heightened scrutiny and initiated an investigation into an aspect of Plaintiff's daily work routine that had not previously resulted in inquiry or discipline.

108. Defendant thereafter subjected Plaintiff to an adverse employment action by terminating his employment on March 14, 2025.

109. The temporal proximity between Plaintiff's protected activity and his termination, combined with Defendant's deviation from ordinary disciplinary and investigative practices and its reliance on a selectively enforced policy as grounds for termination, supports a causal connection between Plaintiff's accommodation request and his termination.

110. Defendant's stated reason for Plaintiff's termination was a pretext, and the real reason for the adverse action was retaliation for Plaintiff's protected activity under the ADA.

111. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff suffered lost wages, lost benefits, emotional distress, and other compensable damages.

112.    Defendant acted willfully and with reckless indifference to Plaintiff's rights under the ADA, entitling Plaintiff to all available legal and equitable relief.

**FOURTH CAUSE OF ACTION**
**Race Discrimination in Violation of**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.**

113.    Plaintiff incorporates by reference each and every allegation contained in the paragraphs above, as if fully stated herein.

114.    At all relevant times, Defendant was an employer within the meaning of Title VII.

115.    Plaintiff was employed by Defendant.

116.    Plaintiff is a member of a protected class based on his race, namely Asian (Chinese).

117.    Plaintiff was qualified for his position and satisfactorily performed his job duties for more than twenty years, including at all relevant times prior to his termination on March 14, 2025.

118.    Defendant subjected Plaintiff to an adverse employment action, including but not limited to termination of his employment.

119.    Defendant's stated reason for terminating Plaintiff—use of a personal USB storage device—was not applied uniformly and was routinely disregarded or addressed through progressive discipline for similarly situated employees of other races.

120.    Upon information and belief, non-Asian employees who engaged in comparable or more serious policy violations were not terminated, but instead were afforded warnings, counseling, or lesser disciplinary measures.

121.    Defendant's departure from its ordinary investigative and disciplinary practices, in conjunction with selective enforcement of policy, supports an inference that Defendant's stated justification for Plaintiff's termination was pretextual.

122.    Plaintiff's race was a motivating factor in Defendant's decision to terminate his employment.

123.    Upon information and belief, Defendant subjected Plaintiff to heightened scrutiny and adverse treatment following his February 2025 illness and related leave, and did so in a manner that reflected differential treatment compared to non-Asian employees who engaged in comparable conduct or experienced comparable health issues.

124.    In context, Defendant's treatment of Plaintiff supports an inference that racialized assumptions concerning Plaintiff's Asian race—including assumptions relating to health, safety, or reliability—contributed to Defendant's decision to terminate Plaintiff and were a motivating factor in the adverse employment action.

125.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered lost wages, lost benefits, emotional distress, reputational harm, and other compensatory damages.

126.    Defendant acted with reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to all available legal and equitable relief under Title VII.

**FIFTH CAUSE OF ACTION**
**National Origin Discrimination in Violation of**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.**

127.    Plaintiff incorporates by reference each and every allegation contained in the paragraphs above, as if fully stated herein.

128.    At all relevant times, Defendant was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b).

129.    Plaintiff was employed by Defendant.

130.    Plaintiff is a member of a protected class based on national origin, being of Chinese descent and perceived by Defendant as having ties to China and Asia.

131.    Plaintiff was qualified for his position and performed his job duties satisfactorily throughout his employment with Defendant, including in the period immediately preceding his termination.

132.    Defendant subjected Plaintiff to an adverse employment action, including termination of his employment on March 14, 2025.

133.    In early 2025, Plaintiff requested and was approved for a permitted leave of absence to travel to Asia to visit a terminally ill relative.

134.    Also in early 2025, Plaintiff took sick leave related to a respiratory infection and thereafter had a lingering cough that managers noticed.

135.    Following Plaintiff's approved travel plans to Asia and his related illness in early 2025, Defendant subjected Plaintiff to heightened scrutiny and adverse treatment, including selective enforcement of policy and targeting Plaintiff for investigation and termination, in a manner not applied to similarly situated employees who did not share Plaintiff's national origin.

136.    In context, Defendant's conduct supports a reasonable inference that Plaintiff's national origin and perceived foreign ties—including assumptions concerning loyalty, trustworthiness, health, or operational risk associated with his Chinese descent and approved travel to Asia—influenced Defendant's decision to terminate Plaintiff and were a motivating factor in the adverse employment action.

137. Defendant's conduct occurred under circumstances giving rise to an inference of national origin discrimination, including selective enforcement, heightened scrutiny following Plaintiff's Asia travel plans, and reliance on stereotypes tied to Plaintiff's heritage.

138. As a direct and proximate result of Defendant's unlawful discrimination based on national origin, Plaintiff suffered economic loss, emotional distress, and other compensable injuries.

139. Defendant's conduct was willful and in reckless disregard of Plaintiff's rights under Title VII, entitling Plaintiff to all available relief.

**SIXTH CAUSE OF ACTION**
**Race Discrimination in violation of**
**New York State Human Rights Law, N.Y. Exec. Law § 296 ("NYSHRL")**

140. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs above, as if fully stated herein.

141. At all relevant times, Defendant was an employer within the meaning of the New York State Human Rights Law ("NYSHRL").

142. Plaintiff was employed by Defendant.

143. Plaintiff is a member of a protected class based on his race, namely Asian (Chinese).

144. Plaintiff was qualified for his position and performed his job duties satisfactorily throughout his employment with Defendant.

145. Defendant subjected Plaintiff to an adverse employment action, including termination of employment on March 14, 2025.

146. Defendant's stated reason for Plaintiff's termination—an alleged data-security policy violation—was selectively enforced and not applied uniformly to similarly situated non-Asian employees, resulting in Plaintiff being treated less well because of his race.

147. Upon information and belief, non-Asian employees who engaged in comparable or more serious conduct were not terminated and were afforded warnings, counseling, or progressive discipline.

148. In context, Defendant's treatment of Plaintiff—including heightened scrutiny following his illness and selective enforcement of policy—supports an inference that racialized assumptions associated with Plaintiff's Asian race contributed to the adverse action.

149. Plaintiff's race was a motivating factor in Defendant's decision to terminate his employment, in violation of the NYSHRL.

150. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered lost wages, lost benefits, emotional distress, reputational harm, and other compensable damages.

151. Defendant's conduct was willful and in reckless disregard of Plaintiff's rights under the NYSHRL, entitling Plaintiff to all available legal and equitable relief, including compensatory damages, punitive damages, attorneys' fees, and costs.

**SEVENTH CAUSE OF ACTION**
**National Origin Discrimination in violation of**
**New York State Human Rights Law (N.Y. Exec. Law § 296)**

152. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs above, as if fully stated herein.

153. At all relevant times, Defendant was an employer within the meaning of the New York State Human Rights Law ("NYSHRL").

154. Plaintiff is a member of a protected class based on national origin, being of Chinese descent and perceived by Defendant as having ties to China and Asia.

155. Plaintiff was qualified for his position and performed his job duties satisfactorily throughout his employment with Defendant.

156. Defendant subjected Plaintiff to an adverse employment action, including termination of employment on March 14, 2025.

157. In early 2025, Plaintiff requested and was approved for a permitted leave of absence to travel to Asia to visit a terminally ill relative.

158. Following Plaintiff's approved travel plans to Asia, Defendant subjected Plaintiff to heightened scrutiny and differential treatment, including selective enforcement of policy, in a manner not applied to similarly situated employees who did not share Plaintiff's national origin.

159. Defendant's stated reason for Plaintiff's termination — an alleged data-security policy violation — was selectively enforced against Plaintiff.

160. Upon information and belief, similarly situated employees who did not share Plaintiff's national origin were not terminated but were instead afforded warnings, counseling, or progressive discipline.

161. Defendant's conduct occurred under circumstances giving rise to an inference of national origin discrimination, including selective enforcement of policy and heightened scrutiny following Plaintiff's approved travel plans.

162. Plaintiff's national origin was a motivating factor in Defendant's decision to terminate his employment, in violation of the NYSHRL.

163. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered lost wages, lost benefits, emotional distress, reputational harm, and other compensable damages.

164. Defendant's conduct was willful and in reckless disregard of Plaintiff's rights under the NYSHRL, entitling Plaintiff to all available legal and equitable relief, including compensatory damages, punitive damages, attorneys' fees, and costs.

**EIGHTH CAUSE OF ACTION**
**Race Discrimination in Violation of 42 U.S.C. § 1981**

165. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs above, as if fully stated herein.

166. 42 U.S.C. § 1981 prohibits race discrimination in the making, performance, modification, and termination of contracts, including employment relationships.

167. Plaintiff is a member of a racial minority, namely Asian (Chinese).

168. At all relevant times, Plaintiff had a valid contractual employment relationship with Defendant, including the right to make and enforce contracts and to enjoy the benefits, privileges, terms, and conditions of employment.

169. Plaintiff was qualified for his position and performed his job duties satisfactorily throughout his employment with Defendant.

170. Defendant subjected Plaintiff to an adverse employment action, including termination of his employment on March 14, 2025.

171. Defendant intentionally discriminated against Plaintiff on the basis of race by selectively scrutinizing Plaintiff, enforcing workplace policies against him in a disparate manner, and terminating his employment, thereby interfering with Plaintiff's contractual right to

continued employment on equal terms, while similarly situated non-Asian employees were treated more favorably.

172.    Defendant's stated reason for Plaintiff's termination—an alleged data-security policy violation—was not applied uniformly and was enforced against Plaintiff in a manner different from similarly situated employees outside Plaintiff's racial class.

173.    Defendant's actions occurred under circumstances giving rise to an inference of intentional race discrimination, including disparate enforcement of policy and deviation from ordinary disciplinary practices.

174.    Plaintiff's race was a but-for cause of Defendant's decision to terminate his employment.

175.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered lost wages, lost benefits, emotional distress, reputational harm, and other compensable damages.

176.    Defendant's conduct was willful, wanton, and in reckless disregard of Plaintiff's federally protected rights under 42 U.S.C. § 1981, entitling Plaintiff to compensatory and punitive damages, attorneys' fees, costs, and all other appropriate relief.

## DAMAGES

177.    As a result of UPS's unlawful conduct, Plaintiff has suffered lost wages and career momentum, lost medical and other benefits, loss of valuable retirement benefits for which he invested over two decades of his life (including additional contributions toward Mr. Pan's 401(k) plan promised to non-union employees under a 2023 bargaining agreement), related emotional distress from a false accusation, and other damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendant as follows:

(a)      Back pay, front pay, and lost benefits including Mr. Pan's fully vested pension

plan, health, and other benefits, and all agreed upon additional contributions toward Mr. Pan's

401(k) plan promised to non-union employees under a 2023 bargaining agreement;

(b)      Compensatory damages;

(c)      Liquidated damages under the ADEA;

(d)      Punitive damages where permitted;

(e)      Attorneys' fees and costs;

(f)      Pre- and post-judgment interest;

(g)      Reimbursement of expenses memorialized in outstanding expense reports; and

(h)      Such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: Brooklyn, New York                   RESPECTFULLY SUBMITTED
February 5, 2026                             LAW OFFICE OF ALAN JOHNSON

                                            By:  Alan Johnson, Esq.
                                                 1510 De Kalb Avenue, 1R
                                                 Brooklyn, NY 11237
                                                 Tel: (917) 693-2089
                                                 alan@alanjohnsonlaw.com

                                                 Attorney for Plaintiff, Kin Ho Michael Pan